IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |  |
|---|---|---|
| WILLIE THOMAS, | ) | |
| Petitioner, | ) ) ) | |
| v. | ) ) | Case No. 2:13-cv-02720-STA-dkv |
| CHERRY LINDAMOOD, | ) ) | |
| Respondent. | ) ) ) | |

**ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2254,
DENYING A CERTIFICATE OF APPEALABILITY,
CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH,
AND
DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court is the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("§ 2254 Petition") filed by Petitioner, Willie Thomas, Tennessee Department of Correction prisoner number 464217, an inmate at the South Central Correctional Facility ("SCCF") in Clifton, Tennessee. (§ 2254 Pet., ECF No. 1.) For the reasons stated below, the Court **DENIES** the § 2254 Petition.

**I.    BACKGROUND**

    **A.    State Court Procedural History**

On March 5, 2009, a grand jury in Shelby County, Tennessee, returned a single-count indictment charging Thomas with the first degree murder of Jacqueline Smith Thomas. (Indictment, *State v. Thomas*, No. 09-01487 (Shelby Cnty. Crim. Ct.), ECF No. 14-1 at PageID 54-55.) On December 7, 2009, the day the case was set for trial, Thomas entered a guilty plea to second degree murder in exchange for a negotiated sentence of eighteen years to be served at

100% as a violent offender. (Pet. for Waiver of Trial by Jury and Request for Acceptance of Plea of Guilty, *id.*, ECF No. 14-1 at PageID 56; Guilty Plea Hr'g Tr. 3-4, *id.*, ECF No. 14-2.)

At the guilty plea hearing, the prosecutor summarized the factual basis for the charge:

> The facts giving rise to the indictment is that on September 1st, 2008, at approximately 6 p.m., police officers were called to 2120 Clarksdale here in Shelby County, Tennessee. Upon arrival, officers observed Willie Thomas in the backyard of 2120 Clarksdale holding a .22-caliber rifle. Thomas was taken into custody without incident. They observed that his wife Jacqueline Thomas had been shot one time and was lying in the dining room floor of the house. She was transported to the Regional Medical Center where she later died. The medical examiner's office determined that she died from a gunshot wound and ruled her death a homicide.
>
> It was learned that Willie Thomas and Jacqueline Thomas were arguing just prior to the shooting. During the verbal altercation, Willie Thomas went and retrieved a .22-caliber rifle, pointed it at Jacqueline Thomas and shot her.
>
> The witnesses, the people who were in the house, were her — Jacqueline Thomas' brother, a Darrell Smith, which we believe was the subject of the argument and her two grandchildren who are both teenagers. They would be the proof that would be presented to the Court.
>
> There is [sic] also several members of his neighborhood that are here as well and that the State has talked to. And in regards to that, we feel it is an intentional killing, but we would have problems proving premeditation. So therefore, we are making this recommendation to the Court and asking the Court to accept the plea.

(Guilty Plea Hr'g Tr. 4-5, *id.*, ECF No. 14-2.) Defense counsel stated that

> we would stipulate had this matter gone to trial that those would have been the facts that the State would have produced. I do agree with the statement that Ms. Branham just made in that there may not have been the ability to prove premeditation but there was a known [sic] killing and so my client having been explained all of this wants to accept this as a best interest plea, rather than going to trial and running the risk of being sentenced or convicted on first.

(*Id.* at 5.) During the voir dire examination, Thomas was asked whether he committed the acts that the prosecutor had related. He replied, "I did, I did, I did it, I did the murder. I did it." (*Id.* at 9.) He stated that "I plead guilty to that." (*Id.*)

Thomas testified that he understood the rights he was waiving by pleading guilty. (*Id.* at 11-12.) He testified that "I gave it all up." (*Id.* at 12.) At that point, the following exchange occurred:

> THE COURT: Are you doing this freely and voluntarily?
>
> THE DEFENDANT: I'm ready to get it over with.
>
> THE COURT: I understand but are you doing this freely—
>
> THE DEFENDANT: Freely.
>
> THE COURT: —and voluntarily?
>
> THE DEFENDANT: On my own, yeah.
>
> THE COURT: Okay. No one is forcing you to plead guilty, are they?
>
> THE DEFENDANT: Nobody is forcing me. Nobody is twisting my arm.
>
> THE COURT: Who made the decision to plead guilty today?
>
> THE DEFENDANT: Me and the good Lord above made that decision.
>
> THE COURT: It was your decision after you prayed over it?
>
> THE DEFENDANT: Right.
>
> THE COURT: Are you satisfied [with] the representation your lawyer has given you?
>
> THE DEFENDANT: Very good representation. I just got to face the fact I got to get this over with.

(*Id.* at 12-13.)

3

The trial judge advised Thomas that if he were convicted of first degree murder the only available punishment would be life imprisonment. (*Id.* at 13-14.) According to the trial judge, "Basically, that would give you the possibility of parole if you were convicted but you'd serve 51 years prior to that time." (*Id.* at 14.) Thomas was advised that the range of punishment for second degree murder is fifteen to sixty years. (*Id.*) The judge also stated as follows:

> In your case the recommendation is 18 years confinement with the Department of Correction, the penitentiary, and this is what we talked about before as a violent offender. That means your release eligibility is at 100 percent. And what they talked about is while you're doing your time, you have the possibility of earning some good and honor time up to 15 percent, good and honor time. But you need to understand that the judgment paper is marked as a violent offender 100 percent release eligibility on the 18-year sentence. . . .

(*Id.*) Thomas reaffirmed that he wanted to plead guilty. (*Id.* at 15.) The trial judge accepted Thomas's guilty plea and imposed the negotiated sentence. (*Id.*) Judgment was entered on December 7, 2009. (J., *State v. Thomas*, No. 07-01487 (Shelby Cnty. Crim. Ct.), ECF No. 14-1 at PageID 57.) Thomas did not take a direct appeal, having waived the right to do so.

On June 17, 2010, Thomas filed a *pro se* petition in the Shelby County Criminal Court pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122. (Pet. for Post-Conviction Relief, *Thomas v. State*, No. 07-01487 (Shelby Cnty. Crim. Ct.), ECF No. 14-1 at PageID 58-69.) Counsel was appointed to represent Thomas (Order Appointing Private Counsel to Represent Indigent Pet'r, *id.*, ECF No. 14-1 at PageID 70), and an amended petition was filed on or about June 30, 2011 (Am. Pet. for Post Conviction Relief, *id.*, ECF No. 14-1 at PageID 71-78). A hearing on the post-conviction petition was held on August 3, 2011. (Post-Conviction Hr'g Tr., *id.*, ECF No. 14-3.) At the conclusion of the hearing, the post-conviction court denied the petition on the record. (*Id.* at 66-77.) A written order denying

4

relief was entered on August 4, 2011. (Order Denying Pet. for Post-Conviction Relief, *Thomas v. State*, No. 07-01487 (Shelby Cnty. Crim. Ct.), ECF No. 14-1 at PageID 79-92.) The TCCA affirmed. *Thomas v. State,* No. W2011-01795-CCA-R3-PC, 2012 WL 5416597 (Tenn. Crim. App. Nov. 6, 2012), *appeal denied* (Tenn. Mar. 5, 2013).

### B. Procedural History of Thomas's § 2254 Petition

On September 13, 2013, Thomas filed his *pro se* § 2254 Petition. (§ 2254 Pet., ECF No. 1.) The sole issue presented is "[i]neffective assistance of trial counsel." (*Id.* at PageID 5.) On October 5, 2013, the Court directed Respondent, SCCF Warden Cherry Lindamood, to file the complete state-court record and a response to the § 2254 Petition. (Order, ECF No. 4.)

On February 13, 2014, the Warden filed her Answer to Petition ("Answer") and the state-court record. (Answer, ECF No. 13; Not. of Filing, ECF No. 14.) On February 25, 2014, Thomas filed a motion seeking the appointment of counsel. (Mot. for Appointment of Counsel, ECF No. 15.) On March 17, 2014, the Court denied appointment of counsel but extended Thomas's time to reply to the Answer by thirty days. (Order, ECF No. 16.) Thomas did not file a reply.

## II. THE LEGAL STANDARD

The statutory authority for federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted).

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Id.* at 181-82, 185. A state court's decision is "contrary to" federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).[1] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The state court's application of clearly

---

[1] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

established federal law must be "objectively unreasonable." *Id.* at 409. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Williams*, 529 U.S. at 411. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

"[W]hen a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, . . . [t]he prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'" *Titlow v. Burt*, 134 S. Ct. 10, 15 (2013) (quoting 28 U.S.C. § 2254(e)(1)). A state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination.").[2] The Supreme Court has described this standard as "demanding but not insatiable " and has emphasized that "deference does not by

---

[2] In *Wood*, 558 U.S. at 299, the Supreme Court granted certiorari to resolve whether, "to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." The Court ultimately found it unnecessary to reach that issue, and left it open "for another day". *Id.* at 304-05; *see also id.* at 301 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006), in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable). In *Titlow*, 134 S. Ct. at 15, the Supreme Court applied § 2254(e)(1)'s "clear and convincing" standard but cautioned that "[w]e have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), and we need not do so here."

definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (internal quotation marks and alteration omitted).

### III. ANALYSIS OF PETITIONER'S CLAIM

In his § 2254 Petition, Thomas argues that his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment. (§ 2254 Pet. at PageID 5, ECF No. 1.) Specifically, Thomas claims that "[m]y plea was unknowingly and involuntarily entered due to my attorney [failing] to fully inform me regarding my plea and his continuous coercion and fear tactics he used that resulted in my decision to plead Guilty rather than challenge my case in trial." (*Id.*)

The following evidence was introduced at the evidentiary hearing on the post-conviction petition:

> Trial counsel testified he was retained to represent Petitioner on his first degree murder charge. He had a "good working relationship" with Petitioner and his family, and Petitioner's family was very helpful in communicating with him and helping him locate witnesses. Trial counsel did not tell Petitioner the case would probably be settled for a guilty plea to criminally negligent homicide, and they discussed all of the possibilities. He said they would have discussed the ranges of punishment and the lesser-included offenses. Trial counsel testified he investigated everything himself and spoke with all potential witnesses. He then filed a number of pre-trial motions and had Petitioner evaluated by West Tennessee Forensics, Inc. Trial counsel testified that Petitioner's defense was that the shooting was accidental. In fact, Petitioner intended to point the gun at his wife's brother and chase him out of the home. However, the defense was inconsistent with witnesses' statements, including that of Petitioner's grandchildren.
>
> Trial counsel testified Petitioner entered a guilty plea on December 2, 2009. During the plea colloquy, Petitioner had some questions concerning one-hundred percent service of the sentence. As a result of the questions, there was a recess, and trial counsel spoke with Petitioner again "to make sure that he had any and all questions answered." He did not recall Petitioner asking the trial court if it was too late to change his mind about the plea. Trial counsel testified the trial court made certain Petitioner understood his "sentence was at a hundred percent; and whatever release eligibility was not part of the plea—that was not something that anyone would assure him." Trial counsel further said:

> What was also discussed was that, I think if any percentage was discussed, it was eight-five percent—either [the State] or the court might have said that it is true that even on a hundred-year sentence—I mean a hundred-year—a hundred-percent sentence, there still may be some eligibility after eighty-five percent of it was complete. That's the only discussion I remember having about that.

Trial counsel felt Petitioner understood the percentage of his sentence to be served and the consequences of his plea.

On cross-examination, trial counsel testified that during the plea colloquy, the trial court allowed him to clear up any misunderstanding regarding the percentage of the sentence to be served. Concerning his conversation with Petitioner, trial counsel said:

> I mean the conversation was very straight forward. It was basically a regurgitation of what we talked about on the stand in that he doesn't have to enter this plea; but that if he does, it will be marked as a violent offense, and it will be a hundred percent. And, in fact, when I readdressed the court and telling the court that I'd spoken with him and that he would like to come back up on the stand, I even say, "I feel like I answered his questions. He has an understanding that the sentence is an eighteen-year sentence and the judgment sheet is marked at a hundred percent; and I think he still wants to go forward with his plea; so if I could"—and we brought his [sic] back around.

The trial court then went back through and voir-dired Petitioner again to make sure he understood. Petitioner then told the court he was freely entering his plea, and no one was forcing him to plead guilty.

Petitioner testified that trial counsel met with him "maybe three times," and he gave trial counsel names of all his witnesses. Trial counsel said he spoke with all the witnesses. Concerning the offense, Petitioner testified that he and the victim had an argument because her brother, who was a "crack cocaine addict" was living with them. He said during the argument, his brother-in-law grabbed a chair and "slammed" him into the next room where the rifle was located. Petitioner testified he then took the rifle and the victim grabbed it as he walked by, and the gun went off, and she was struck by the bullet.

Petitioner testified trial counsel told him he would be convicted of first degree murder if the case went to trial, and he would receive sixty-one years. He said trial counsel had initially told him that he would not accept anything less than "negligent homicide with time served" because the shooting was an accident. Petitioner testified he learned of the State's plea offer on the day of trial, and trial

9

counsel told him that he "could get anywhere from sixty percent to seventy percent." He said when the trial court told him that he would serve one-hundred percent, trial counsel said, "The judge have [sic] to say it like that, you know, for his record." Petitioner testified trial counsel also said the trial court "really don't mean it like that." He said trial counsel then "wrote it all down—forty percent—sixty-percent—he said, 'This is what really will happen, right here.'"

Petitioner testified trial counsel scared and coerced him into pleading guilty by telling him that he would serve sixty-one years if the case went to trial. Petitioner agreed that during the guilty plea submission hearing, he told the trial court he was satisfied with trial counsel's representation, and he understood he was pleading guilty to eighteen years "at a hundred percent, which really calculates possibly to eighty-five percent before you're release eligible[.]" Petitioner claimed he agreed to what the trial court said because trial counsel told him "the judge have [sic] to say it like that."

On cross-examination, Petitioner insisted that he did not believe he would have been convicted of first degree murder if the case had gone to trial. He agreed that he would have served more than eighteen years if he had been convicted as charged. Petitioner admitted he had the opportunity to change his mind about going to trial, but he claimed trial counsel scared him into pleading guilty. He never told the trial court that trial counsel was scaring him because he had "faith" in trial counsel. Petitioner testified he did not understand everything the trial court reviewed with him at the guilty plea submission hearing. However, Petitioner admitted he took the eighteen-year offer freely, and he told the trial court he voluntarily accepted the offer. . . . Petitioner said that eighteen years sounded better than sixty-one years, and he accepted the plea offer "because [his] grand kids, they was gonna use them as witnesses; and whatever they said, somebody else had to tell them because they wasn't there." Petitioner claimed that no one, other than him and the victim, were in the house when the victim was killed.

*Thomas v. State*, 2012 WL 5416597, at *1-3.

A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance.

10

The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Richter*, 562 U.S. at 104 (internal quotation marks and citations omitted).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[3] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Richter*, 562 U.S. at 104; *see also id.* at 112 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

The two-part test stated in *Strickland* applies to challenges to guilty pleas based on the ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 57-58 (1985); *see also Premo v. Moore*, 562 U.S. 115, 123-27 (2011) (discussing application of *Strickland* to guilty pleas under § 2254(d)). "Where, as here, a defendant is represented by counsel during the plea process and

---

[3] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Id.* at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Hill*, 474 U.S. at 56 (internal quotation marks omitted). "[T]o satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59; *see also Padilla v. Kentucky*, 559 U.S. 356, 372 (2010) ("[T]o obtain relief on this type of claim, a [prisoner] must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.").[4] A prisoner "cannot make that showing merely by telling [the court] now that [he] would have gone to trial then if [he] had gotten different advice. The test is objective, not subjective . . . ." *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012). The Supreme Court also emphasized that "it is often quite difficult for petitioners who have acknowledged their guilt to satisfy *Strickland*'s prejudice prong." *Padilla*, 559 U.S. at 371 n.12.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

---

[4] The Supreme Court emphasized that,

> [i]n many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than going to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Hill*, 474 U.S. at 59.

An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

*Richter*, 562 U.S. at 105.

When an ineffective assistance claim is reviewed under § 2254(d), the review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles,* 556 U.S., at 123, 129 S. Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

Here, the TCCA denied relief on the merits, reasoning as follows:

Petitioner contends trial counsel "scared" him into pleading guilty, and he was not fully informed regarding his plea. Concerning Petitioner's guilty plea, the post-conviction court set forth in its order denying post-conviction relief:

13

The lengthy and extensive colloquy between the Petitioner and the trial court at the plea submission hearing indicates that the trial court asked the Petitioner if the plea was freely and voluntarily made; if he had been informed of the elements of the crime, burden of proof, and defenses. The trial court questioned the petitioner to ensure that the petitioner understood: (1) the nature of the charges against him; (2) that by pleading guilty he was giving up the right to a trial by jury; (3) that by pleading guilty he was giving up the right . . . to confront witnesses; and (4) that by pleading guilty he was giving up the right to [not be subject to] self-incrimination.

In other words the trial court satisfied the requirements of *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). Moreover, the petitioner had pleaded guilty in the past and presumably was aware of his options even before this colloquy (see attached bond report). The petitioner had failed to prove that his guilty plea was not knowing or voluntary. This issue is without merit.

A review of the transcript of the plea hearing reflects that the trial court thoroughly reviewed and explained [to] the petitioner his rights, the offenses to which he was pleading guilty, and the sentence which he was receiving. The Petitioner repeatedly assured the trial court that he understood his rights and the consequences of his guilty plea.

The trial court further found Petitioner's testimony at the post-conviction hearing was contradictory with his testimony at the guilty plea submission hearing, and the court pointed out all of the discrepancies between the two hearings. The post-conviction court said Petitioner's statements at the post-conviction hearing were not credible, and the court resolved "all credibility issues against the petitioner." At the post-conviction hearing, the post-conviction court specifically said that it accredited trial counsel's testimony. The record in this case does not preponderate against the trial court's findings.

At the guilty plea submission hearing, Petitioner initially informed the trial court that he did not agree to serve his eighteen year sentence for second degree murder at one-hundred percent, and he thought the sentence would be served at "about 60 percent or 70 percent or maybe even less." He also asked if it was too late to change his mind, and the trial court informed him that he could change his mind. The State pointed out that according to the law, Petitioner would become eligible for parole after eighty-five percent of the sentence was served. The trial court asked Petitioner to step down from the witness stand, and he spoke with trial counsel about the matter.

Petitioner then returned to the courtroom and trial counsel announced he had answered Petitioner's questions, and Petitioner had an understanding that "the

sentence is an 18-year sentence and the judgment sheet is marked at 100 percent." Petitioner resumed the witness stand, admitted he committed the murder, and said he wanted to plead guilty to the offense. Petitioner told the trial court that trial counsel reviewed and explained everything to him, and he "pretty much" understood everything. The trial court then reviewed all of Petitioner's rights with him, and Petitioner said that he understood them. Petitioner told the trial court that he gave up all of his rights and that he was entering the plea freely and voluntarily. Petitioner specifically said, "I'm ready to get it over with." Petitioner testified that no one was forcing him or "twisting [his] arm," and he and the "good Lord above made that decision." He also said he was satisfied with trial counsel's representation and that it was "[v]ery good representation." The trial court again reviewed the plea agreement with petitioner and told him that his release eligibility on the eighteen-year sentence was one-hundred percent. The trial court further informed Petitioner that he was charged with first degree murder and was facing a life sentence, which gave him the possibility of parole in fifty-one years if convicted.

Trial counsel testified that during the plea colloquy, the trial court allowed him to clear up any misunderstanding regarding the percentage of the sentence to be served. He said when Petitioner left the witness stand, they had a "very straight forward conversation." Trial counsel testified, "It was basically a regurgitation of what we talked about on the stand in that he doesn't have to enter this plea; but that if he does, it will be marked as a violent offense, and it will be a hundred percent." At the post-conviction hearing, Petitioner admitted he never told the trial court that trial counsel had coerced or scared him into pleading guilty, and he said "eighteen years sound[s] a lot better than sixty-one years." He also said he pled guilty because his grandchildren were "going through a whole lot," and he did not want them to have to testify at trial.

Based on the record, we conclude that Petitioner has failed to show by clear and convincing evidence that his guilty plea was involuntarily or unknowingly entered, that he received ineffective assistance of counsel or that he was prejudiced by any alleged ineffective assistance of counsel. Petitioner is not entitled to relief in this appeal.

*Thomas v. State*, 2012 WL 5416597, at *5-6.

Because the § 2254 Petition does not address the standards for evaluating habeas claims on the merits, it is unclear whether Thomas contends that the decision of the TCCA was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or whether it "was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

Thomas has not established that the decision of the TCCA was contrary to *Strickland v. Washington* and *Hill v. Lockhart*. The TCCA's decision is "a run-of-the-mill state-court decision applying the correct legal rule [from *Strickland* and *Hill*] to the facts of a prisoner's case," *see Thomas*, 2012 WL 5416597, at *4, and, therefore, it "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause," *Williams v. Taylor*, 529 U.S. at 406.

Thomas also has failed to satisfy his burden of demonstrating that the decision of the TCCA was an unreasonable application of *Strickland* and *Hill* or that it was based on an objectively unreasonable factual determination. Thomas contends that he did not fully understand his release eligibility when he pled guilty and that his attorney scared him into accepting the plea offer by telling him that, if the case went to trial, he would be sentenced to sixty-one years.[5] The state courts credited the testimony of Matthew John, Thomas's attorney, that he explained that, as a violent offender, Thomas would be required to serve one hundred percent of his sentence but that he could receive up to fifteen percent off his sentence for program credits. The trial judge also advised Thomas of his release eligibility, and Thomas said that he understood. Thomas has failed to demonstrate that the TCCA's factual finding that his plea was intelligent is objectively unreasonable.

Thomas's claim that his attorney scared him into pleading guilty is also meritless. Thomas made clear that he accepted the plea offer to avoid the risk of a life sentence. Defense

---

[5] In Tennessee, inmates sentenced to life imprisonment are eligible for parole after 51 years, assuming they receive the maximum sentence credits. By the time of the post-conviction hearing, Thomas may not have remembered the precise amount of time he would have had to serve before becoming eligible for parole had the case gone to trial.

counsel conducted a thorough investigation and personally interviewed every witness. Thomas's brother-in-law and two teenage grandchildren were prepared to testify for the State had the case gone to trial. Notwithstanding Thomas's contention at the post-conviction hearing that the death of his wife was an accident, no witness other than himself would have supported that defense. The law is clear that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Strickland*, 466 U.S. at 690. Thomas has not satisfied his burden of demonstrating that the TCCA's conclusion that he failed to show deficient performance or prejudice was an unreasonable application of *Strickland* or that it was based on an objectively unreasonable factual finding.

Because every claim asserted by Petitioner is without merit, the Court **DENIES** the § 2254 Petition. The § 2254 Petition is **DISMISSED WITH PREJUDICE**. Judgment shall be entered for Respondent.

**IV.    APPEAL ISSUES**

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003); *Bradley v. Birkett*, 156 F. App'x 771, 772 (6th Cir. 2005). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the petitioner

17

demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Cockrell*, 537 U.S. at 336 (internal quotation marks omitted); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Cockrell*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011). Courts should not issue a COA as a matter of course. *Bradley*, 156 F. App'x at 773.

In this case, there can be no question that the § 2254 Petition is meritless for the reasons previously stated. Because any appeal by Petitioner on the issue raised in his § 2254 Petition does not deserve attention, the Court **DENIES** a certificate of appealability.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5). In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore **CERTIFIED**, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is **DENIED**.[6]

---

[6] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).

**IT IS SO ORDERED.**

                                    **s/ S. Thomas Anderson**
                                    S. THOMAS ANDERSON
                                    UNITED STATES DISTRICT JUDGE

                                    Date:   September 27, 2016.